**In the Matter of NINA MERCHANDISE CORPORATION, Debtor.**

**Bankruptcy No. 80 B 10542.**

United States Bankruptcy Court,
S. D. New York.

Sept. 5, 1980.

Samuels & Grossman, New York City, for debtor/applicant.

Finkel, Goldstein, Berzow, New York City, for Vanguard Extruders Inc. (opposing creditor).

Richards & O'Neil, New York City, for the Interim Trustee—Jon Yard Arnason.

BURTON R. LIFLAND, Bankruptcy Judge.

The issue presented for the Court's consideration is whether to dismiss or suspend this ongoing bankruptcy proceeding.

On April 18, 1980, an involuntary petition in bankruptcy under Chapter 7 (liquidation) was commenced against the debtor, Nina Merchandise Corporation ("Nina") by three of its creditors–Vanguard Extruders, Inc. ("Vanguard"), Coburn Corporation ("Coburn"), and Modern Braid Mfg. Co., Section 303(a), (b) of the Bankruptcy Reform Act of 1978 ("Bankruptcy Code")[1]. The filing was precipitated by bitter disagreement between the two stockholders of the Debtor, Kalman Horvath ("Horvath") and Milton Tepper ("Tepper"), which interfered with the ability of the Debtor to operate as a going concern. According to the creditors' allegations, Nina was not paying its obligations as they became due, (because of the dispute).

Almost immediately after filing the involuntary petition (and before a determination by this Court on whether to grant the petitioning creditors' requested order for relief) the petitioning creditors applied for the appointment of an interim trustee, Section 15303, which is the Bankruptcy Code counterpart to the appointment of a receiver under the now superseded 1898 Bankruptcy Act. See, Bankruptcy Rule 201 and Section 105(b). Horvath, the president of Nina, appeared by counsel (Martin Streit, Esq.) at the April 8, 1980 hearing and opposed the appointment.[2] The request was

granted, however, upon a showing by petitioning creditors that Mr. Horvath had taken custody and control of the Debtor's assets and was using Dorian Merchandise Corp., a newly formed corporation owned by him, to collect the outstanding accounts receivable of the Debtor. An order was signed the following day, April 29, 1980, and the United States Trustee for the Southern District of New York[3] appointed Jon Yard Arnason from its panel of private trustees. B.R.A. § 224(a), 28 U.S.C. 586(a)(1).

On June 5, 1980, the order for relief requested by the petitioning creditors was also granted.[4] The Debtor had failed to timely controvert the involuntary petition (an answer was due by May 9, 1980), which made the granting of the requested relief automatic. Section 303(h). An "answer" filed on behalf of Horvath was conceded as insufficient to contest the petition. Section 303(d) and see note 2 *supra*.

Thereafter, having retained new counsel, Horvath, now purporting to act on behalf of the Debtor, attempted on June 25, 1980 to obtain an order to show cause, which among other things, sought to vacate the Court's order for relief on the ground that a timely answer to the involuntary petition had been filed. New counsel's supporting papers demonstrated an unfamiliarity with the record of the prior proceedings in this case. A memo endorsement was promptly entered on the proposed order refusing the application as being factually inconsistent and at complete variance with the record.

---

1. All statutory references may be found in Title 11 of the United States Code, unless otherwise indicated. See, Section 101 of the Bankruptcy Reform Act of 1978 ("B.R.A.") Pub.L. 95–598, 92 Stat. 2683.

2. Horvath made appearances by his personal attorney, including the filing of a pleading styled as an "answer" to the petition, in his personal capacity, but not on behalf of the corporation. He conceded that he could not act on behalf of the corporation because of the stockholders' impasse. On the other hand, Tepper, the other stockholder, testified as a witness for the petitioning creditors in support of the involuntary petition.

3. The Southern District of New York is one of the 10 pilot districts in the experimental United States Trustee program. See, Section 1501.

4. Prior to the entering of the order for relief, Mr. Horvath and Vanguard had negotiated a settlement of Nina's outstanding indebtedness to Vanguard, which culminated in a signed written agreement. As part of that agreement, Vanguard was to petition the Bankruptcy Court for a dismissal of the complaint, but failed to do so in light of subsequently encountered misrepresentations by Mr. Horvath and because of Mr. Horvath's failure to make payments on schedule. A total of $10,000 of the $30,000 accord was paid to Vanguard and this money is being held in escrow.

Undaunted, the Debtor (its corporate authority to act still in doubt) now seeks again to extricate itself from the inhospitable arena of the Bankruptcy Court. By an order to show cause dated July 7, 1980, the Debtor, through Horvath, sought to (1) have the proceedings pending before this Court stayed, while a State Court action is filed to determine the validity of Vanguard's and Coburn's claims; (2) have the proceeding dismissed if it is determined that Vanguard and Coburn are ultimately owed nothing and all other creditors have been paid in full; and (3) alternatively, to be allowed to file an answer contesting the allegations in the involuntary petition.

Mr. Horvath's affidavit accompanying the order to show cause claims that the sole objective of the petitioning creditors is "to use the bankruptcy proceedings as a bludgeon to extract personal gain from the debtor and deponent." Mr. Horvath further states that he "refuse(s) to be further subjected to the 'shakedown' tactics and extortionary demands of Vanguard and Coburn." In response, Vanguard retorted by detailing post–petition negotiated efforts by Horvath to pay Vanguard a sum less than the amount it was willing to accept in full settlement of the amount it claimed to be due from the Debtor. In short, the unwholesome spectre of Horvath removing pressing creditors from the proceedings by offering and making payments from assets of the estate emerged.

Presently, outside of Vanguard and Coburn, no less than six other creditors still have outstanding claims. The total sum of these claims is relatively small (about $5,000) compared to Vanguard's large claim of about $30,000. The Debtor's "Let's Make a Deal" application offers to suspend the administration of the Bankruptcy proceeding, and pay off the remaining small creditors if the Court would countenance its proposal. During the pendency of the contested proceeding, Mr. Horvath has apparently already made arrangements to satisfy $75,568.03 in other creditors' claims, asserting that $15,000 came from his own personal resources. The interim trustee (in a memorandum in opposition to the Debtor's order to show cause) characterized these informal payments "at the very least [to] represent a voidable preference under § 549(b) of the Bankruptcy Code and quite conceivably a violation under 18 U.S.C. § 152." There is also some doubt cast as to whether Mr. Horvath has met any claims from out of his own pocket since it has been asserted that the moneys expended by him may well have been proceeds of Nina's accounts receivables that passed into Dorian Merchandise Corp. At the very least, the remaining unpaid creditors are entitled to an investigation into the acts, conduct and property of the Debtor and the disposition of its assets to insure that they receive equality of distribution of those assets.

A hearing on the Debtor's order to show cause was held on July 31, 1980. At that time, the Debtor shifted its requested relief by conceding the jurisdiction of the Bankruptcy Court as the forum in which to determine the validity of the Vanguard and Coburn claims. In fact, the only vitality left to the Debtor's application is a provisional request for dismissal should the Vanguard and Coburn claims be ultimately found to be groundless, conditioned of course upon all other creditors having been paid in full. The objective of the proposal, according to Horvath, is to prevent irreparable injury to his own reputation and to prevent the "irretrievable destruction" of the Debtor's business. Mr. Horvath is quite concerned, and rightly so, that the trustee will pursue possible preferential payments made to creditors out of the Debtor's assets. Further, he points to the desirability of avoiding administrative expenses, (while ignoring the already substantial and uncompensated administrative efforts of a trustee and his counsel in place since April of this year). Vanguard, in opposition, explains that Horvath's true motivation is his desire to promote his new business venture, Dorian Merchandise Corp., and that this entails the maintenance of satisfactory relations with those creditors of Nina, who Mr. Horvath will continue to need.

The Debtor's plea is based upon two legal grounds:

746

■ First, and denoted "Point I" of the Debtor's brief, Debtor asserts that "Where it becomes apparent during the course of the proceedings that the debtor is able to pay its debts as they mature the proceedings should be dismissed", citing *In re Missouri Pacific Railroad Company*, 93 F.Supp. 832 (E.D.Mo.1950) as dispositive. *The Missouri Pac. R.R.* case (a case under the now repealed 1898 Bankruptcy Act) is inapposite.

The out of context synthesis of the holding used by the Debtor dealt with the special case of a railroad reorganization filed under old Section 77 of the Bankruptcy Act. The Debtor railroad's petition alleged that it was unable to meet its debts as they matured and desired to effect a plan of reorganization. The Court reasoned that since the inability of the Debtor to meet its debts as they matured was the basic fact that gave rise to the Court's jurisdiction, when this fact was no longer true, the Court should dismiss the proceeding. The purpose of the proceeding had been achieved and as a court of equity, the Court could and should dismiss. Compare, Bankruptcy Reform Act Section 241(a), 28 U.S.C. § 1481.

The opinion specifically distinguishes reorganization from liquidation cases. "In ordinary bankruptcy proceedings it is settled that the proceedings will be dismissed when a bankrupt becomes solvent and pays or otherwise satisfies or discharges his debts." *Id.* at 858. This is not the situation in the present case. The Debtor has not yet paid, satisfied or discharged *all* outstanding debts.

As to the Debtor's stated point, it would fail as it does not even apply by analogy. This Court did not only enter the order for relief because "the debtor is generally not paying such debtor's debts as such become due", Section 303(h)(1), (an allegation never denied), but also because the Debtor failed to timely controvert the involuntary petition, which made the entering of the order for relief *mandatory* under Section 303(h).

■ Lastly, (and not raised as a ground for dismissal) Section 707 would allow the Bankruptcy Court to dismiss a Chapter 7 case for "cause". However, here again, the Debtor would fare no better. The legislative history of this section states:

The section does not contemplate, however, that the ability of the debtor to repay his debts in whole or in part constitutes adequate cause for dismissal.

House Report No. 95–595, 95th Cong., 1st Sess. (1977) 380; Senate Report No. 95–989, 95th Cong., 2d Sess. (1978) 94, U.S.Code Cong. & Admin. News 1978, pp. 5787, 6336. This message is quite instructive. Not only does the Debtor's point not satisfy the "cause" requisite, but from this it can also be seen that even had this been a Section 303(h)(1) situation, Debtor's analogy to *Missouri Pac. R.R.* would still fail. Congress' intent is clear. It has determined that dismissal should not be granted because of the ability of the debtor to pay off some or all outstanding creditors. See also, *Blackmon and Blackmon*, 3 B.R. 167, 6 BCD 66, Bank. L.Rep. (CCH) ¶ 67,368 (S.D.Ohio 1980). Accordingly, Debtor's first ground for dismissal is rejected.

■ Second, and denoted "Point II" of the Debtor's brief, Debtor states that, "Under Section 305 of the Bankruptcy Code, 11 U.S.C. § 305, the Court is statutorily empowered to dismiss or suspend all proceedings if the interest of creditors and the debtor would be better served by such dismissal or suspension." This is an accurate extraction from Section 305(a)(1), which provides in full:

§ 305 Abstention

(a) The Court, after notice and a hearing, may dismiss a case under this title or may suspend all proceedings in a case under this title, at any time if—

(1) the interests of creditors and the debtor would be better served by such dismissal or suspension.

Clearly, the Bankruptcy Code vests this Court with the power to dismiss or suspend this involuntary proceeding where the condition set forth in subparagraph (1) to § 305 is met; but, Is this case appropriate for such an abdication of jurisdiction? I think

not. This case does not contain the circumstances where abstention would be in the best interests of the creditors and the Debtor.

Guidance to the general instances in which abstention should be exercised is somewhat elucidated by the Section's accompanying legislative history, which states:

A principle of the common law requires a court with jurisdiction over a particular matter to take jurisdiction. This section recognizes that there are cases in which it would be appropriate for the court to decline jurisdiction. . . . Thus, the court is permitted, if the interests of creditors and the debtor would be better served by dismissal of the case or suspension of all proceedings in the case, to so order. The court may dismiss or suspend under the first paragraph, for example, if an arrangement is being worked out by creditors and the debtor out of court, there is no prejudice to the rights of creditors in that arrangement, and an involuntary case has been commenced by a few recalcitrant creditors to provide a basis for future threats to extract full payment. The less expensive out-of-court workout may better serve the interests in the case. . . .
House Report No. 95–595, 95th Cong., 1st Sess. (1977) 325; Senate Report No. 95–989, 95th Cong., 2d Sess. (1978) 35, U.S. Code Cong. & Admin. News 1978, pp. 5787, 6281.

■ While the legislative history does not provide exacting detail, it is evident that § 305 "contemplates the instance where a non–federal insolvency has proceeded so far in those proceedings that it would be costly and time–consuming to start afresh with the federal bankruptcy process." *In Matter of Lang*, 5 B.R. 371, at n.4 (S.D.N.Y.1980, Babitt, B. J.). A "cost benefit analysis" is central to the statute.

Further insight can also be gleaned from *International Shoe Co. v. Smith–Cole, Inc.*, 62 F.2d 972 (10th Cir. 1933), a pre–code case cited by the Debtor with a slightly different twist from that of the example found in the legislative history, but also within the spirit of the statute.

*International Shoe* involved a State Court insolvency proceeding in which a court appointed receiver distributed a ratable 25% dividend to each creditor as a composition. International Shoe, one creditor, refused to participate on the basis of a "company policy" not to involve itself in liquidation proceedings outside the federal Bankruptcy Court and instituted an involuntary petition. The Bankruptcy Court abstained from jurisdiction on two grounds. First, and not relevant here, was the narrow ground that the bankrupt's insolvency had not been proven. Second, and an alternative holding, the Court concluded that the case should be dismissed because the State Court's solution was fair, ("There is neither charge, proof nor intimation that appellant or any other creditor would get a cent more if the effort now made to unscramble the state court proceedings were successful"),[5] and relitigating the same issues in the Bankruptcy Court would needlessly drain the Debtor's limited assets through the surcharge of administrative expenses.

In short, the Court in *International Shoe* determined to abstain from exercising its jurisdiction after taking into account the need to promote judicial economy and prevent economic waste, while making sure that creditors were provided with an equitable apportionment.

Viewing the instant case in the light of Section 305's legislative history and *International Shoe*, this Court is reluctant to dismiss an apparently well–founded petition. The facts, as presented, are not persuasive for this Court's exercise of abstention. See, Miller & Cook, *A Practical Guide to the Bankruptcy Reform Act*, at 78–80 (1979).

Though, as explained earlier, the Debtor made movements in the direction of the example found in the legislative history to § 305, it failed to go far enough. The

5. *Id.* at 974.

748

Debtor adduced no proof of "future threats to exact full payment." The rhetoric of "shakedown tactics" and "extortionary tactics" by Mr. Horvath finds no basis in the record.[6] There has been no showing by the Debtor or Mr. Horvath that any of the petitioning creditors commenced the involuntary proceeding to secure an unfair advantage or engage in some type of overreaching. In fact, their motivation appears to be just the opposite; they are seeking the protection given to creditors by the bankruptcy law, which includes the right to an equitable apportionment of the Debtor's estate. Nor have any ongoing state court proceedings, arrangements, settlements, *et cetera*, been brought to this Court's attention which will be disrupted. There will be no redundancy by proceeding in the federal Bankruptcy Court. The petitioning creditors (and all remaining creditors) are entitled to an investigation into the Debtor's affairs.

Neither is the instant case, as Debtor posits, analogous to *International Shoe*. Any unwinding of this suit that may be necessary, and the resultant costs, is due solely to the Debtor's and Mr. Horvath's maneuvers in attempting to topple and short circuit a bankruptcy proceeding, not to a recalcitrant creditor or creditors. In addition, unlike *International Shoe*, if this petition were dismissed, there will be no judicial oversight. If ever a failed business situation needed hindsight dissection, it appears to be this one.

Further distinguishing this case is the acute lack of any provision for payment of the Vanguard and Coburn claims (assuming they are found valid). Neither the Debtor nor Horvath offered to post a bond or other type of security to cover the claims. The Debtor's proposed plan for Mr. Horvath to pay off all other remaining creditors, thus freeing up assets of the estate and leaving a "larger piece of the pie" is no substitute. In addition, since Mr. Horvath's source of

funding may indirectly be the Debtor corporation itself, creditors Vanguard and Coburn would be prejudiced, not benefited, by the Debtor's proposed actions.

Finally, contrary to Mr. Horvath's explication, this Court does not see how dismissal can promote the interests of the Debtor. The Debtor has ceased doing business; it is being liquidated. The success of Dorian Merchandise Corp., Mr. Horvath's new business, is not of concern to this Court.

To sum up, "Abstention by this court would be an abdication of its responsibility and would have the effect of 'passing the buck' to another court." *In re Macon Uplands Venture*, 2 B.R. 421, 428, 5 B.C.D. 1082, 1087, 1 C.B.C.2d 246, 256 (Bkrtcy. D.Md. 1979). Abstention in this case would not better serve the interests of creditors and the Debtor. Accordingly, dismissal or suspension on the basis of Section 305 is also denied.[7]

The Debtor's motion is denied in full. It is so ordered.

**6.** Horvath's and Vanguard's aborted settlement negotiations, see Note 4, *supra*, evidence no impropriety or any lack of good faith by Vanguard.

**7.** A decision to abstain or not abstain is not reviewable by appeal or otherwise. The determination is left entirely to the discretion of the Bankruptcy Court. Section 305(c).